UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------X

JOHNNY CHIBUEZE IROAKAZI,

                              Plaintiff,                           **REPORT AND
                                                                   RECOMMENDATION**

               -against-                                           18 Civ. 8193 (VB) (AEK)

KILOLO KIJAKAZI,[1]
ACTING COMMISSIONER OF SOCIAL SECURITY,

                              Defendant.
----------------------------------------------------------------------X

**TO: THE HONORABLE VINCENT L. BRICCETTI, U.S.D.J.[2]**

        Plaintiff Johnny Iroakazi brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of the final decision of Defendant Commissioner of Social Security (the

"Commissioner"), which denied his application for benefits under the Social Security Act (the

"Act").  ECF No. 1.  Currently pending before the Court are Plaintiff's motion, and the

Commissioner's cross-motion, for judgment on the pleadings pursuant to Rule 12(c) of the

Federal Rules of Civil Procedure.  ECF Nos. 14, 18.  For the reasons that follow, I respectfully

recommend that the Plaintiff's motion (ECF No. 14) be GRANTED, that the Commissioner's

motion (ECF No. 18) be DENIED, that judgment be entered in favor of Plaintiff, and that the

case be remanded to the Commissioner for further proceedings.

---

[1] Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi has been substituted as the Defendant in this action.

[2] This case was originally referred to Magistrate Judge Lisa Margaret Smith on September 10, 2018.  ECF No. 7.  The case was reassigned to the undersigned on October 15, 2020.

# BACKGROUND

## I.      Procedural History

On August 5, 2014, Plaintiff filed an application for Supplemental Security Income

("SSI") benefits pursuant to the Act, alleging November 22, 2012 as the onset date of his

disability.  Administrative Record ("AR") 178-87.[3]  Plaintiff claimed he was disabled due to

"mental disability."  AR 89.  Following the denial of Plaintiff's claim by the Social Security

Administration (the "SSA") on March 25, 2015, Plaintiff requested a hearing before an

administrative law judge ("ALJ").  AR 133-38.  An administrative hearing was held on July 24,

2017.  AR 40-87.  Plaintiff appeared and testified at the hearing and was represented by an

attorney, Anthony Hoyle.  *See* AR 42.  A medical expert, Dr. Edward N. Halperin, and a

vocational expert, Dr. Pat Green, both testified by telephone at the hearing.  AR 57-85.

ALJ Lucian A. Vecchio issued a decision on August 15, 2017, finding that Plaintiff was

not disabled within the meaning of the Act.  AR 10-20.  Plaintiff subsequently filed a request for

review of the ALJ's decision with the SSA's Appeals Council, which was denied on July 11,

2018.  AR 1-4.  That made the ALJ's August 15, 2017 decision the final decision of the

Commissioner.  The instant lawsuit, seeking judicial review of the ALJ's decision, was filed on

September 7, 2018.  ECF No. 1.

## II.      The Supreme Court's Decision in *Carr v. Saul* and Plaintiff's Decision to Proceed

On April 22, 2021, the Supreme Court issued a decision in *Carr v. Saul*, 141 S. Ct. 1352

(2021), in which it held that applicants for Social Security disability benefits who had hearings

conducted, and/or decisions issued, by an ALJ whose appointment was not in accordance with

---

[3] Citations to "AR" refer to the certified copy of the administrative record filed by the
Commissioner.  ECF No. 13.

the Appointments Clause of the U.S. Constitution were not required to administratively exhaust their Appointments Clause challenges during proceedings before the SSA before raising such challenges for the first time in federal court.

In light of the *Carr* decision, and to promote efficiency and judicial economy, this Court issued an order on May 10, 2021 directing the parties to meet and confer regarding whether this case should be remanded to the Commissioner for a new hearing before a constitutionally appointed ALJ different from the ALJ who previously heard and adjudicated Plaintiff's claim for benefits. *See* ECF No. 21. The May 10, 2021 Order noted that in this case, the hearing before ALJ Vecchio was conducted, and ALJ Vecchio's decision was issued, before the appointments of any SSA ALJs were ratified by the Acting Commissioner of the SSA in July 2018. *Id.*; *see* 84 Fed. Reg. 9583 (2019) (Social Security Ruling 19-1p). Plaintiff was ordered to submit a letter on or before June 1, 2021 setting forth whether or not he believed the case should be remanded, and the Commissioner was authorized to submit a response, if necessary, on or before June 8, 2021. ECF No. 21. The Order stated that "[s]hould Plaintiff elect not to request a remand on the Appointments Clause issue at this stage, this may constitute a waiver of the Appointments Clause challenge in all further proceedings, including appeals." *Id.* The Order also specified that "[a] decision not to request a remand will not prejudice the Plaintiff in any way before this Court, nor will it affect the timing of this Court's decision on the pending motions in this matter should the case remain in federal court." *Id.*

On June 1, 2021, the parties submitted a joint letter in response to the Order. ECF No. 22. Plaintiff's counsel informed the Court that Plaintiff declined to request remand on the basis of the Appointments Clause, and elected to have the matter decided on the merits. *Id.* The

Commissioner took no position, and did not contest Plaintiff's decision not to request a remand based on the Appointments Clause issue.  *Id.*

### III.    Medical Evidence

Plaintiff has provided a summary of the medical evidence contained in the administrative record.  *See* ECF No. 15 ("Pl.'s Mem.") at 4-10.  The Commissioner states in her memorandum of law that she does not challenge Plaintiff's recitation of the facts, "except for any inferences, arguments, or conclusions made by Plaintiff therein," and then proceeds to recite what she considers to be the "relevant facts."  ECF No. 19 ("Def.'s Mem.") at 1-2.  Based on an independent and thorough examination of the record, the Court finds that the parties' summaries of the contents of the medical evidence are largely comprehensive.  Accordingly, the Court adopts the factual background as set forth by the parties, and discusses the evidence in the record in more detail to the extent necessary to a determination of the issues in this case.  *See, e.g.*, *Banks v. Comm'r of Soc. Sec.*, No. 19-cv-929 (AJN) (SDA), 2020 WL 2768800, at *2 (S.D.N.Y. Jan. 16, 2020), *adopted by* 2020 WL 2765686 (S.D.N.Y. May 27, 2020).

### IV.    Non-Medical Evidence

Plaintiff partially completed a Function Report dated March 14, 2015.  *See* AR 216-26. Plaintiff reported that he has problems paying attention because he feels "a mental haze."  AR 216.  Although he answered "no" to the question "Can you finish what you start?," Plaintiff maintained that he could follow spoken and written instructions.  *Id.*  Plaintiff asserted that he did not have any problems getting along with authority figures like bosses or teachers and that he had never lost a job because of problems getting along with other people.  *Id.*

With respect to certain activities of daily living, Plaintiff stated that he shops in stores for clothing and food for himself, and is able to pay bills and count change.  AR 218.  In response to

the question of whether his ability to handle money had changed since his condition began, Plaintiff reported that he always has trouble concentrating, but can manage "with a little help." *Id.* Plaintiff listed his hobbies as tattooing, rollerblading, and music, but noted that it had become harder to motivate himself to do these hobbies. *Id.* Plaintiff noted that he spends time weekly with others playing videogames or handball, and hangs out in the park or at friends' homes, but sometimes "feels down." AR 219. On this particular form, Plaintiff claimed that he has problems getting along with friends, but not family. *Id.* According to Plaintiff, he experienced a loss of interest in certain physical activities due to his condition. *Id.*

Plaintiff explained that his father mostly prepares his meals, though on occasion he will do so himself. AR 220. He asserted, however, that he eats "poorly," including fast food, and does not have adequate money for food. *Id.* at 220-21. Plaintiff reported that he tries to help with the laundry, but needs to be reminded to help out due to his "mental cloudiness." AR 220. In addition, Plaintiff stated that when he goes out, he travels by walking, and can do so alone; he did not have a driver's license at the time he completed the Function Report, but said he was trying to obtain one. *Id.*

Regarding personal hygiene, Plaintiff reported that he barely shaves, uses the toilet only when needed, dresses poorly, and forgets to bathe or care for his hair. AR 221-22. But Plaintiff asserted that he does not require special assistance or reminders to take care of his personal needs and grooming, and claimed that he does not need help or reminders to take his medication. AR 221.

V.     **Hearing Testimony**

    a.     **Plaintiff's Testimony**

At the time of the hearing before ALJ Vecchio, Plaintiff was 28 years old.  AR 43.

Plaintiff testified that the last year of schooling he completed was the ninth grade, and that his

last job was at the Sports and Arts Foundation.  AR 43-44.  According to Plaintiff, he is no

longer able to work due to his bipolar disorder, which makes him nervous around people and

causes mood swings and depression.  AR 44.  Plaintiff first received treatment for his bipolar

disorder when he was 21 years old; he testified that he was presently taking medication for his

bipolar disorder, specifically Haldol, Depakote, and Cogentin.  AR 44-45.

Plaintiff testified that his bipolar disorder affected how he slept, causing insomnia and

broken sleep three days per week.  AR 45-46.  Additionally, Plaintiff testified that his medication

caused stomach pain.  AR 46.  Due to the interruptions in his sleep, Plaintiff sometimes would

take naps during the day, which typically would last for approximately three hours.  *Id.*  Plaintiff

explained that his bipolar disorder affected how he interacted with people, including his father

and autistic brother—he "sometimes get[s] very angry with them," and his arguments with

family members sometimes escalated to physical confrontations.  AR 46-47.  Plaintiff also

testified that he was arrested "once or twice," including one time in 2014 when he punched a

wall and his father called the police.  *Id.*

In response to questioning regarding his prior employment, Plaintiff testified that he

worked at the Sports and Arts Foundation in 2014 in a part-time job as an after-school tutor, but

his bipolar disorder sometimes affected his functioning.  AR 48.  Specifically, Plaintiff

sometimes did not pay attention to what the kids at the after-school program were doing, and he

was disciplined or reprimanded for lateness or missing work "a couple of times."  *Id.*  Plaintiff

worked there for two years, but according to Plaintiff, the termination of his employment did not have anything to do with his bipolar disorder. *Id.*

Plaintiff testified that he did his own grocery shopping and did his own laundry at a laundromat in his co-op building. AR 48-49. He usually travels outside his home with others, specifically his childhood best friend who lived in the same building; Plaintiff testified that he does not like being alone, "because I have a fear that something might happen to me." AR 49.

Plaintiff testified that he had been receiving regular medical care from Dr. Joseph Squitieri for his bipolar disorder for "a year and some change." AR 49-50. Plaintiff explained that he sees Dr. Squitieri every three weeks, that his sessions typically last for approximately 15 minutes, and that Dr. Squitieri prescribes him medication. AR 50. Plaintiff discusses his depression with Dr. Squitieri, and Dr. Squitieri adjusts the doses of Plaintiff's medication based on Plaintiff's reported side effects. *Id.* Plaintiff reported that his medications were making him calmer and more focused, and that it is when he does not take his medication that "things go bad." *Id.* Plaintiff testified that sometimes he would run out of medication because his prescription would not be filled in time, and that sometimes his father needed to remind him to take his medication. AR 50-51. According to Plaintiff, his father also has needed to remind him to go to the doctor, because he had forgotten about doctor appointments on at least three occasions. AR 51-52.

Plaintiff testified that he was in special education classes until fifth grade, and was held back in eighth grade. *Id.* Since August 2014 (approximately three years from the filing date of his application for SSI benefits), Plaintiff has used marijuana "once in a while," usually while stressed and in social situations. AR 52-53. Plaintiff testified that before he began treatment with Dr. Squitieri, a doctor who treated him previously had him attend a detoxification program

that drug-tested participants and assigned them sponsors.  AR 53.  Plaintiff testified, however,

that he was not referred to this program because he struggled with substance abuse—instead, he

asserted that the substance abuse counseling program was added to his treatment for bipolar

disorder.  AR 53-54.

Plaintiff testified that his bipolar disorder affected his ability to perform daily activities

around the house because, for example, his inattentiveness and depression would prevent him

from cleaning.  AR 54.  Plaintiff described a typical day as beginning at 10:00 a.m., when he

would take his medications, shower, brush his teeth, and eat breakfast; Plaintiff's father would

send him to the supermarket, and Plaintiff would wait for his brother to return from school

around 4:00 p.m.  *Id.*  Plaintiff would stay up until 6:00 or 7:00 p.m., and would then take a nap

or hang out with friends in his co-op until approximately 10:30 p.m., before going to sleep

around 12:00 a.m.  *Id.*

Plaintiff testified that when he spends time with friends, they listen to music and talk, or

go rollerblading or biking, or play handball.  *Id.*  Plaintiff testified that when he was not taking

his medication, or took it late, he experienced mood swings and stress that affected his

relationships with friends, citing an incident when he ran out of Cogentin and got into a violent

argument.  AR 55-56.  According to Plaintiff, he takes steps to make sure he always takes his

medicine in a timely fashion, and asked his doctor to send his prescriptions ahead of time.  AR

56.  Plaintiff insisted he could not hold a simple job because he cannot be around people he does

not know—Plaintiff testified that his only friends are childhood friends who know he has bipolar

disorder, and "don't really judge" him when he becomes angry or argumentative.  *Id.*  Plaintiff

also testified that he had considered working for Uber at one time, but chose not to apply due to

the stress and depression he felt after he and his daughter's mother fought over custody of their child.  AR 58-59.

### b. Medical Expert Testimony

Dr. Halperin, a psychiatrist, testified by telephone as a medical expert at the hearing, and offered his medical opinion based on his review of the medical record and information provided by Plaintiff at the hearing.  *See* AR 57-75.  Dr. Halperin testified that there are times when Plaintiff seemed to have manic episodes and times when he was agitated or depressed, but Dr. Halperin concluded that the record as a whole showed "a person who's adapting and doing reasonably well and stabilized with the medicine he's taking . . . really, [exhibiting] the ups and downs of normal living rather than of the illness."  AR 59.  According to Dr. Halperin, Plaintiff is "reasonably well stabilized"—he has worked before, has friends, and despite his "mood swings and a potential to lose control," is "capable of having a low-stress job."  *Id.*

Dr. Halperin determined that Plaintiff had no limitation in his ability to understand, remember, or apply information; mild to moderate limitation in his ability to interact with others; mild limitation in his ability to concentrate, persist, or maintain a certain pace; and mild to moderate ability to adapt or manage himself.  AR 60.  Notably, Dr. Halperin disagreed with Dr. Squitieri's findings of marked limitations in Plaintiff's cognitive functioning.  AR 64.  Based on Dr. Halperin's review and evaluation of the record, in particular the treatment notes from Dr. Squitieri at Exhibit 12-F, he concluded that Plaintiff is "reasonably well functioning much of the time."  *Id.*  This prompted ALJ Vecchio to read portions of Dr. Squitieri's notes into the hearing record, including from Plaintiff's May 11, 2017 appointment.  *See* AR 389.  The ALJ pointed out that Plaintiff reported feeling calmer; not smoking and drinking as much; going to the gym with his father; considering becoming an EMT; and not fighting with his brother as much.  AR 65.

9

Dr. Halperin interjected that "[t]hose are positive things." *Id.*  Referring to a record of Plaintiff's

March 30, 2017 appointment with Dr. Squitieri, AR 391, ALJ Vecchio read into the record that

Plaintiff had reported that he had been glad to get away from his neighborhood to visit his aunt

and uncle in upstate New York since his friends were "doing bad things and using drugs"; at that

appointment, Plaintiff also indicated that he was taking his medications as prescribed.  AR 66.

At that appointment, as recited by ALJ Vecchio, Plaintiff also reported that he was thinking of

applying for his GED; was cutting down on his marijuana use because it was making him

paranoid; and was still seeing his daughter and picking her up from school.  *Id.*  Dr. Halperin

interjected that this information "sounds pretty good."  *Id.*

Dr. Halperin testified that Plaintiff's treatment notes were "inconsistent" with Dr.

Squitieri's summary of Plaintiff's limitations—in Dr. Halperin's view, the summary focuses on

"negative issues," whereas the treatment notes show a patient with an "adjustment disorder"

dealing with "ups and downs in ordinary living."  AR 67.  Dr. Halperin testified that he would

"absolutely" rely more on treatment notes than summary statements.  AR 68.

When asked by Plaintiff's attorney about Dr. Squitieri's assessment, in some of the same

treatment notes that the ALJ had just reviewed, that Plaintiff's judgment was "fair to poor," *see*

AR 389, Dr. Halperin rejected the conclusion of "poor judgment."  AR 68-69.  Dr. Halperin

explained this by focusing on the fact that Plaintiff was taking his medication on a regular basis

and "interact[ing] reliably with the medication."  AR 69.  Dr. Halperin testified that based on his

review of the treatment notes, Plaintiff's insight and judgment were "reasonably good," and his

abstraction was "fair," AR 69-70, despite the fact that Dr. Squitieri's treatment notes regularly

refer to Plaintiff's "insight" being fair or fair-poor, his judgment being fair-poor, and his

"abstraction" being fair or fair-poor, AR 389, 391, 394, 396, 398, 400, 403, 404, 406, 411.

### c.    Vocational Expert Testimony

Dr. Green, a vocational expert, testified by telephone at the hearing.  *See* AR 75-87.  Dr. Green concluded that Plaintiff had not been employed in substantial gainful activity in the last 15 years because he had only performed part-time work.  AR 76.  The ALJ asked Dr. Green to assume a hypothetical claimant of Plaintiff's age, education, and work history, with no significant physical impairments, but several non-exertional limitations.  AR 77.  The ALJ further explained for purposes of this hypothetical that the claimant would need work that required only simple tasks because of his poor attention and moderate limitations in concentration, and could not perform high production or quota work due to poor attention and stress issues.  *Id.*  The hypothetical claimant would need to have limited interaction with the public and others, and might be off-task due to concentration limits no more than five percent per day.  *Id.*  Dr. Green determined that there was work in the national economy that this hypothetical claimant could perform, including as a dishwasher, industrial cleaner, and hand packager.  AR 78.

Plaintiff's counsel asked Dr. Green about an alternate hypothetical claimant, one with claimant's age and education levels, but who could only perform activities with a schedule and consistently be punctual for no more than one-third of the workday, could only work in coordination with or near others without being distracted by them for no more than one-third of the workday, and could only maintain socially appropriate behavior for no more than one-third of the workday.  AR 79-80.  Dr. Green testified that this hypothetical individual would not be able to sustain any type of permanent full-time employment.  AR 80.  When Plaintiff's counsel then added the additional limitation of the hypothetical individual likely being absent from work more than three times each month, Dr. Green again testified that such induvial would not be

expected to be able to sustain full-time permanent employment.  *Id.*  The limitations for the hypothetical claimant posited by Plaintiff's counsel as part of this line of questioning were based on assessments of Plaintiff made by Dr. Squitieri on a mental impairment questionnaire that he prepared on August 2, 2016.

## APPLICABLE LEGAL PRINCIPLES

### I.      Standard of Review

The scope of review in an appeal from a Social Security disability determination involves two levels of inquiry.  First, the court must review the Commissioner's decision to assess whether the Commissioner applied the correct legal standards when determining that the plaintiff was not disabled.  *Tejada v. Apfel*, 167 F.3d 770, 773 (2d Cir. 1999).  "'Failure to apply the correct legal standards is grounds for reversal.'"  *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984).

Second, the court must decide whether the Commissioner's decision was supported by substantial evidence.  *Green-Younger v. Barnhart*, 335 F.3d 99, 105-06 (2d Cir. 2003).  "Substantial evidence means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* at 106 (quotation marks omitted).  When determining whether substantial evidence supports the Commissioner's decision, it is important that the court "carefully consider[] the whole record, examining evidence from both sides."  *Tejada*, 167 F.3d at 774.  "It is not the function of a reviewing court to decide *de novo* whether a claimant was disabled."  *Melville v. Apfel*, 198 F.3d 45, 52 (2d Cir. 1999).  If the "decision rests on adequate findings supported by evidence having rational probative force, [the court] will not substitute [its own] judgment for that of the Commissioner."  *Veino v. Barnhart*, 312 F.3d 578, 586 (2d Cir. 2002).

## II.     Determining Disability

The Act defines "disability" as "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 423(d)(1)(A).  An individual is disabled under the Act if he or she suffers from an impairment which is "of such severity that he [or she] is not only unable to do his [or her] previous work but cannot . . . engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  "'[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  *Id.*

Regulations issued pursuant to the Act set forth a five-step process that the Commissioner must follow in determining whether a particular claimant is disabled.  *See* 20 C.F.R. § 404.1520(a)(4).  The Commissioner first considers whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), (b).  If the claimant is engaged in substantial gainful activity, then the Commissioner will find that the claimant is not disabled; if the claimant is not engaged in substantial gainful activity, then the Commissioner proceeds to the second step, at which the Commissioner considers the medical severity of the claimant's impairments.  20 C.F.R. § 404.1520(a)(4)(ii).  A severe impairment is "any impairment or combination of impairments which significantly limits [the claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  If the claimant suffers from any severe impairment, the Commissioner at step three must decide if the impairment meets or equals a listed impairment; listed impairments are presumed severe enough to render an individual

disabled, and the criteria for each listing are found in Appendix 1 to Part 404, Subpart P of SSA regulations.  20 C.F.R. §§ 404.1520(a)(4)(iii), (d).

If the claimant's impairments do not satisfy the criteria of a listed impairment at step three, the Commissioner must then determine the claimant's residual functional capacity ("RFC").  20 C.F.R. § 404.1520(e).  A claimant's RFC represents "the most [he or she] can still do despite [his or her] limitations."  20 C.F.R. § 404.1545(a)(1).  After determining the claimant's RFC, the Commissioner proceeds to the fourth step to determine whether the claimant can perform his or her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv),(e)-(f).  If it is found that the claimant cannot perform his or her past relevant work, or does not have any past relevant work, the Commissioner proceeds to step five to consider the claimant's RFC, age, education, and work experience to determine whether he or she can make an adjustment to other work. 20 C.F.R. §§ 404.1520(a)(4)(v),(g).  To support a finding that the claimant is disabled, there must be no other work existing in significant numbers in the national economy that the claimant, in light of his or her RFC and vocational factors, is capable of performing. 20 C.F.R. § 404.1560(c).

The claimant bears the burden of proof on the first four steps of this analysis.  *DeChirico v. Callahan*, 134 F.3d 1177, 1180 (2d Cir. 1998).  If the ALJ concludes at an early step of the analysis that the claimant is not disabled, he or she need not proceed with the remaining steps. *Williams v. Apfel*, 204 F.3d 48, 49 (2d Cir. 2000).  If the fifth step is necessary, the burden shifts to the Commissioner to show that the claimant is capable of performing other work.  *DeChirico*, 134 F.3d at 1180.

**DISCUSSION**

Plaintiff seeks to reverse the Commissioner's decision and have the matter remanded to the SSA for further administrative proceedings.  Pl.'s Mem. at 1.  He contends that the ALJ improperly evaluated the medical evidence, and failed to follow the treating physician rule, when he assigned less than controlling weight to Dr. Squitieri's medical opinions.  *See* Pl's Mem. at 13-14.  Additionally, Plaintiff asserts that the ALJ erred by giving significant weight to the opinion of Dr. Halperin, the non-examining medical expert who testified at Plaintiff's hearing.  *See* Pl.'s Mem. at 16-18.  The Commissioner seeks to have her final decision affirmed; she maintains that the ALJ's decision is supported by substantial evidence and is based upon the application of correct legal standards.  *See* Def.'s Mem. at 14-22.

As discussed below, the Court finds that the Commissioner failed to apply the correct legal standards, and therefore respectfully recommends that Plaintiff's motion for judgment on the pleadings be granted, that the Commissioner's motion be denied, and that the matter be remanded to the SSA for further proceedings.

**I.      The ALJ's Decision**

ALJ Vecchio applied the five-step sequential analysis described above and issued a decision finding that Plaintiff was not disabled from August 5, 2014, the date he filed his SSI application, through the date of the decision, August 15, 2017.  AR 19-20.  First, the ALJ found that Plaintiff had not engaged in substantial gainful activity since August 5, 2014.  AR 12.  Second, the ALJ determined that Plaintiff suffered from bipolar disorder, a severe impairment.  *Id.*  Third, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  AR 12-13.

According to the ALJ, Plaintiff retained the RFC to perform a full range of work at all exertional levels, but with certain non-exertional limitations.  AR 13.  Specifically, the ALJ concluded that Plaintiff is limited to performing simple tasks with no high production quota work, needs limited interaction with the public and others, and would be off-task, but not more than five percent of the day.  AR 13-14.  The ALJ determined Plaintiff's RFC by applying the two-step framework described in 20 C.F.R. § 404.1529, concluding first that "the claimant's medically determinable impairments could reasonably be expected to produce the above alleged symptoms."  AR 14.  The ALJ next found, however, that "the claimant's statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record."  *Id.*  The ALJ provided a summary of the evidence in the record, including Plaintiff's Disability Report; his hearing testimony; his admissions to North Central Bronx Hospital in March 2011 and July 2014; notes from a follow-up examination at North Central Bronx Hospital in March 2015; notes from Plaintiff's visits to Riverdale Mental Health Association; and notes from his treatment with Dr. Squitieri.  *See* AR 14-16.

In weighing opinion evidence, ALJ Vecchio assigned partial weight to the opinion of Dr. Howard Tedoff, who performed a consultative psychological evaluation of Plaintiff on March 16, 2015, and assessed a significant impairment in Plaintiff's ability to work outside his home. AR 16.  The ALJ assigned partial weight to this opinion because Dr. Tedoff only examined Plaintiff once, and, according to the ALJ, did not provide a function-by-function breakdown of Plaintiff's specific limitations or adequately address Plaintiff's history of non-compliance with his medication or his prior use of marijuana.  AR 16-17.  In contrast, the ALJ assigned substantial weight to the opinion of Dr. Seth Sebold, who performed a one-time consultative

16

psychological evaluation of Plaintiff on February 25, 2017.  ALJ Vecchio opined that Dr. Sebold's findings "accurately depict the findings in [Plaintiff's] objective treatment records," and he credited Dr. Sebold for providing a function-by-function breakdown of Plaintiff's limitations.

The ALJ summarized the opinions of Dr. Squitieri, acknowledging that Dr. Squitieri concluded, among other things, that Plaintiff "has marked limitations in concentration and persistence and social interactions," that Plaintiff "struggles with symptoms of agitated behavior, irritability, mood changes, not sleeping, and impulsive behavior," that Plaintiff's "condition is chronic, will exceed 12-months in duration, and requires continued treatment," and that Plaintiff could "not work full-time in competitive work at this time."  AR 17.  Although the ALJ acknowledged that Dr. Squitieri was Plaintiff's treating physician, he only assigned "some weight"—"but not controlling or great weight"—to Dr. Squitieri's August 2 and August 4, 2016 opinions because as of those dates Dr. Squitieri had only treated Plaintiff for five months.[4]  In addition, the ALJ stated that Dr. Squitieri "did not mention [Plaintiff's] history of non-compliance or drug abuse in his assessment, which questions how well he was familiar with [Plaintiff] at the time of his opinion."  AR 17; *see* AR 18.

The ALJ next gave "significant weight" to the opinion offered by Dr. Halperin in his hearing testimony, describing that testimony as "consistent with the majority of evidence in the file[,] especially the treatment notes from Dr. Squitieri."  AR 18.  ALJ Vecchio also noted that Dr. Halperin is "board certified in the field of adult psychiatry and his opinion reflects consideration of the entire medical record by a specialist who is familiar with [Plaintiff's]

---

[4] ALJ Vecchio wrote that Dr. Squitieri had "only treated [Plaintiff] for four months" as of the date of the August 2, 2016 opinion, and that Dr. Squitieri had "only treated [Plaintiff] for five months" as of the date of the August 4, 2016 opinion.  AR 17, 18.  Dr. Squitieri's treatment of Plaintiff began on March 3, 2016, almost exactly five months before the August 2 and August 4, 2016 reports were prepared.

treating records and [SSA] regulations." *Id.* Ultimately, the ALJ concluded that the record did not support the degree of limitations alleged by Plaintiff. AR 18.

At the fourth step, the ALJ determined that Plaintiff had no past relevant work. *Id.*

At the fifth step, the ALJ found that based on Plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that Plaintiff can perform. AR 19. The ALJ noted, however, that Plaintiff's ability to perform work at all exertional levels was compromised by his non-exertional limitations. *Id.* Thus, "[t]o determine the extent to which these limitations erode the occupational base of unskilled work at all exertional levels," the ALJ consulted the vocational expert to determine "whether jobs exist in the national economy for an individual with the claimant's age, education, work experience, and [RFC]." *Id.* Based on the vocational expert's testimony, the ALJ found that Plaintiff "is capable of making a successful adjustment to other work that exists in significant numbers in the national economy," and determined that a finding of "not disabled" was appropriate under the framework of section 204.00 of the Medical-Vocational Guidelines. *Id.* The ALJ therefore concluded that Plaintiff was not disabled from the date of his application for benefits, August 5, 2014, through the date of the decision, August 15, 2017. AR 19-20.

## II.     The ALJ's Evaluation of the Medical Evidence

### a.     Legal Standard for Application of the Treating Physician Rule

As a general matter, an ALJ is directed to consider "every medical opinion" in the record, regardless of its source. 20 C.F.R. § 404.1527(c).[5] Yet not every medical opinion is assigned

---

[5] Citations to SSA regulations in this section are to the version of the "treating source rule" that is applicable to claims filed before March 27, 2017. Plaintiff filed for SSI on August 5, 2014; accordingly, this version of the treating source rule is the applicable standard for this matter.

the same weight.  Under SSA regulations, the opinions of a treating source as to the nature and severity of a claimant's impairments are generally, but not always, entitled to "more weight" relative to those from other treatment providers.  *See* 20 C.F.R. § 404.1527(c)(2); *Diaz v. Shalala*, 59 F.3d 307, 313 (2d Cir. 1995).  Such opinions are given controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence" in the record.  20 C.F.R. § 404.1527(c)(2); *Rugless v. Comm'r of Soc. Sec.*, 548 F. App'x 698, 700 (2d Cir. 2013) (summary order).  Conversely, opinions from treating sources "need not be given controlling weight where they are contradicted by other substantial evidence in the record."  *Veino*, 312 F.3d at 588; *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004) (a treating source opinion is not afforded controlling weight if it is "not consistent with other substantial evidence in the record, such as the opinions of other medical experts.").

In the event that a treating source's opinion is not given controlling weight, the ALJ must still consider various factors to determine the appropriate amount of deference to assign to that opinion.  These factors include: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship; (iii) the extent to which the medical source provides relevant evidence to support an opinion; (iv) the extent to which the opinion is consistent with the record as a whole; (v) whether the opinion is given by a specialist; and (vi) other factors which may be brought to the attention of the ALJ.  20 C.F.R. §§ 404.1527(c)(2)(i)-(ii),(c)(3)-(c)(6).  The ALJ need not provide a "slavish recitation of each and every factor where the ALJ's reasoning and adherence to the regulation are clear."  *Atwater v. Astrue*, 512 F. App'x 67, 70 (2d Cir. 2013) (summary order); *see also Martinez-Paulino v. Astrue*, No. 11-cv-5485 (RPP), 2012 WL 3564140, at *16 (S.D.N.Y. Aug. 20, 2012) ("It is not

necessary that the ALJ recite each factor explicitly, only that the decision reflects application of

the substance of the rule.") (citing *Halloran*, 362 F.3d at 32).   Nonetheless, the Commissioner

must "always give good reasons in [his or her] notice of determination or decision for the weight

[he or she] give[s] [a claimant]'s treating source's opinion," 20 C.F.R. § 404.1527(c)(2), and

must "comprehensively set forth reasons for the weight" ultimately assigned to the treating

source, *Halloran*, 362 F.3d at 33.   "Failure to provide 'good reasons' for not crediting the

opinion of a claimant's treating physician is a ground for remand."   *Snell v. Apfel*, 177 F.3d 128,

133 (2d Cir. 1999).   Certain findings, however, such as whether a claimant is disabled and cannot

work, are reserved to the Commissioner.   20 C.F.R. § 404.1527(d)(1).

**b.  The ALJ's Application of the Treating Physician Rule**

Dr. Squitieri began treating Plaintiff on March 3, 2016, at which point he conducted a

complete intake assessment of Plaintiff including his past medical and psychiatric history.   AR

446-51.   At this first visit, Dr. Squitieri discussed with Plaintiff, among other things, Plaintiff's

history of substance abuse and his medication regimen, and mentioned the need for continued

monitoring of substance use issues and the need to "monitor compliance" with medications.   AR

449.   Medical records indicate that Dr. Squitieri continued to treat Plaintiff regularly from March

3, 2016 up to and including May 11, 2017, with a total of 12 appointments during that 14-month

period.[6]   AR 389-415.   Dr. Squitieri completed an impairment questionnaire on August 2, 2016,

and provided a treating source statement in the form of a letter dated August 4, 2016,

---

[6] There is no reason to believe that Plaintiff stopped treatment as of May 11, 2017, and
there is no indication in Dr. Squitieri's session notes that treatment terminated as of that date.
*See* AR 389-90.   Dr. Squitieri received a request for production of medical records on April 26,
2017, in advance of the July 24, 2017 hearing, AR 380-81, so the May 2017 "cutoff" was most
likely the date of Plaintiff's most recent appointment before Dr. Squitieri produced Plaintiff's
medical records.

approximately five months into his treatment relationship with Plaintiff.  AR 359-63, 364.  In the impairment questionnaire, which is in the form of a checklist, Dr. Squitieri concluded that Plaintiff has various limitations, including marked limitations in performing activities within a schedule and consistently being punctual, working in coordination with others without becoming distracted, getting along with coworkers or peers without distracting them, and maintaining socially appropriate behavior.  AR 362.  Dr. Squitieri also found that Plaintiff had a number of moderate-to-marked limitations in the categories of concentration and persistence, social interactions, and adaptation.  *Id.*

The treating source letter, which is in the form of two narrative paragraphs, explained that Plaintiff began treatment with Dr. Squitieri for continued treatment of bipolar disorder, and that he "had been struggling with symptoms of agitated behavior, irritability, mood changes, not sleeping, and impulsive behavior."  AR 364.  According to Dr. Squitieri, "[t]he clinical interview and history confirmed this diagnosis."  *Id.*  Even though Dr. Squitieri noted that Plaintiff "has been compliant with medications and visits," Dr. Squitieri explained that Plaintiff's "condition is chronic and will exceed 12 months in duration and requires continued treatment."  *Id.*  As further set forth in Dr. Squitieri's narrative report, "[t]he condition limits [Plaintiff's] ability to interact appropriately with others at times and also impairs his ability to focus, follow through on activities and tasks[,] and causes distractability [*sic*] and irritability with others at times.  I do not believe that he can work full-time in competitive work at this time and I do believe this disability will last more than 12 months."  *Id.*

Dr. Squitieri's opinions are consistent with information set forth in the treatment notes from the seven sessions that Dr. Squitieri had with Plaintiff prior to preparing these reports. Specifically, on March 31, 2016, Dr. Squitieri reported that Plaintiff's "mind is racing for last 3

days and he has been pacing and not sleeping well," and that he "has been having some problems doing easy things like cleaning his room and keeping up with his hygiene." AR 410. In addition, on April 14, 2016, Dr. Squitieri wrote that Plaintiff said he "will sleep a lot sometimes during the day," and reported side effects of "some weakness in legs and feeling tired." AR 408. Further, March 2016 and July 2016, Dr. Squitieri regularly evaluated Plaintiff's "insight" as "fair" or "fair-poor" and his "judgment" as "fair-poor" or "poor." *See* AR 411 (insight: fair-poor; judgment: poor); 408 (insight: fair; judgment: fair-poor); 406 (insight: fair; judgment: fair-poor); 404 (insight: fair; judgment: fair-poor); 403 (insight: fair-poor; judgment: fair-poor); 400 (insight: fair; judgment: fair-poor). Records from subsequent appointments with Dr. Squitieri that took place after the medical opinions were submitted but before the administrative hearing was held are also consistent with these findings. For example, on September 13, 2016, Plaintiff reported that "every other night he has trouble sleeping and can't fall asleep until 3am," and that he had been smoking marijuana "occasionally when stressed," including the night before. AR 396. On January 24, 2017, Plaintiff complained that at times he "gets restless and anxious and hyper," and Dr. Squitieri "talked about setting some boundaries," and "having a more regular sleep schedule." AR 393. These treatment records substantiate Dr. Squitieri's opinion that Plaintiff struggles with agitation, irritability, mood changes, impulsive behavior, and a lack of sleep. AR 364.

* * * * * * * * * *

Courts have recognized that "[b]ecause mental disabilities are difficult to diagnose without subjective, in-person examination, the treating physician rule is particularly important in the context of mental health." *Canales v. Comm'r of Soc. Sec.,* 698 F. Supp. 2d 335, 342 (E.D.N.Y. 2010). Yet as previously discussed, ALJ Vecchio assigned only "some weight" to the

August 2, 2016 questionnaire and August 4, 2016 narrative report completed by Dr. Squitieri, despite acknowledging that Dr. Squitieri was Plaintiff's treating physician.[7]  The ALJ provided two reasons for assigning only "some weight," rather than controlling weight, to Dr. Squitieri's opinions.  First, the ALJ asserted that at the time of the opinions, Dr. Squitieri had only been treating Plaintiff for five months.  Second, the ALJ maintained that Dr. Squitieri never mentioned Plaintiff's history of drug abuse or non-compliance with medications in his opinions, and that this called in to question how familiar Dr. Squitieri was with Plaintiff at the time these opinions were issued.  AR 17-18.  But these explanations, even taken together, do not provide a sufficient basis to discount the opinions of Dr. Squitieri, Plaintiff's treating physician and the only medical source in the record who had a meaningful amount of contact with Plaintiff.  Remand is warranted on this basis.  *Halloran*, 362 F.3d at 33 ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." (quoting 20 C.F.R. § 404.1527(d)(2))).

SSA regulations do not specify how many appointments are necessary for a provider to qualify as a treating source, and courts have found that "there is no minimum number of visits or period of treatment by a physician before this standard is met."  *Marte v. Berryhill*, No. 17-cv-

---

[7] The ALJ expressed concern during the hearing that Dr. Squitieri might not qualify as a physician under SSA regulations because he earned a Doctor of Osteopathy (D.O.) degree, rather than a Doctor of Medicine (M.D.) degree.  *See* AR 61-64.  But SSA regulations clearly provide that osteopaths can qualify as treating sources.  20 C.F.R. § 416.913(a)(1) (effective September 3, 2013 to March 26, 2017); *Schisler v. Sullivan*, 3 F.3d 563, 569 (2d Cir. 1993) ("A claimant's treating source is his or her own physician, osteopath, or psychologist . . . who has provided the individual with medical treatment or evaluation and who has or had an ongoing treatment and physician-patient with the individual.").  The ALJ appears to have recognized this fact, as he ultimately deems Dr. Squitieri a treating source in the decision.  AR 17-18.

3567 (VSB) (JLC), 2018 WL 2979475, at *15 (S.D.N.Y. June 14, 2018) (applying treating

physician rule for physician who had treated plaintiff six times prior to the hearing), *adopted by*

2018 WL 5255170 (S.D.N.Y. Oct. 22, 2018); *Vargas v. Sullivan*, 898 F.2d 293, 294 (2d Cir.

1990) (applying treating physician rule where doctor had been treating patient for three months).

A treating source's opinion is to be accorded more weight than that of a non-treating source

when he or she "has seen [the claimant] a number of times and long enough to have obtained a

longitudinal picture of [the claimant's] impairment . . . ." 20 C.F.R. § 404.1527(c)(2)(i)

(effective August 24, 2012 to March 26, 2017).  This is not a rigid inquiry, however: "courts

have held that SSA adjudicators should focus on the nature of the ongoing physician-treatment

relationship, rather than its length." *Vasquez v. Colvin*, No. 14-cv-7194 (JLC), 2015 WL

4399685, at *20 (S.D.N.Y. July 20, 2015) (quotation marks and brackets omitted); *Schisler v.*

*Bowen*, 851 F.2d 43, 45-46 (2d Cir. 1988).

Here, the ALJ erred in discounting Dr. Squitieri's evaluation based in significant part on

the length of his treatment relationship with Plaintiff.  Dr. Squitieri first saw Plaintiff on March

3, 2016, and continued to see him on an approximately monthly basis. AR 359; *see also* AR

364.  By the time Dr. Squitieri completed the questionnaire and the narrative report, Plaintiff had

seen Dr. Squitieri seven times, and then continued to see and treat Plaintiff for months after the

hearing.  *See* AR 389-415.  While the length of the treatment relationship and the frequency of

examination is a relevant factor for an ALJ to consider if he or she is not going to assign

controlling weight to the opinion of a treating source, the ALJ's decision suggests that a

treatment relationship spanning seven appointments over five months prior to the hearing date is

*per se* an insufficient amount of time to allow for the treating physician's opinion to be given

controlling weight.  There is no basis for such a categorical determination.  *See Vasquez*, 2015

WL 4399685, at *20; *Marte*, 2018 WL 2979475, at *15; *see also Simmons v. U.S. R.R. Ret. Bd.*, 982 F.2d 49, 55 (2d Cir. 1992) ("The *nature*—not the length—of the [physician-patient] relationship is controlling.") (emphasis in original).  Moreover, the ALJ's assessment is further undermined by the medical records themselves, which demonstrate the nature and extent of the treatment relationship between Plaintiff and Dr. Squitieri.  Even though each of Plaintiff's individual sessions with Dr. Squitieri may have only lasted 15 minutes, AR 50, the treatment notes reflect that Dr. Squitieri regularly discussed a range of topics with Plaintiff at each session, including the side effects of Plaintiff's medications, Plaintiff's efforts to cut down on smoking and drinking, and Plaintiff's relationship with his young daughter.  *See* AR 389-415.  Dr. Squitieri's records are a detailed source of information about the progress of Plaintiff's mental health and his day-to-day life, and demonstrate the existence of a relationship that allowed Dr. Squitieri to monitor and assess Plaintiff's progress over time and to develop "a longitudinal picture of [Plaintiff's] impairment."  20 C.F.R. § 404.1527(c)(2)(i).

It is surprising that the ALJ focused on the alleged brevity of Dr. Squitieri's treatment relationship with Plaintiff as a principal basis of discounting his opinions given that the ALJ simultaneously gave the opinions of consultative examiner Dr. Sebold and *non-examining* medical expert Dr. Halperin significant weight.  *See* AR 17-18.  Indeed, a treating source who has seen a patient multiple times is "inherently more familiar with a claimant's medical condition than are other sources," including those that have only seen a patient once.  *Schisler*, 851 F.2d at 47; *see Britt v. Comm'r of Soc. Sec.*, No. 19-cv-6451-LJV, 2020 WL 5077020, at *2 (W.D.N.Y. Aug. 27, 2020) (ALJ erroneously "failed to give any other reason why [treating source]'s opinion was not entitled to deference" after dismissing treating source for only treating plaintiff for four months.).

The ALJ's second proffered reason for giving less weight to Dr. Squitieri's findings does not accurately reflect the medical evidence, and also does not constitute a "good reason" for discounting the findings of Plaintiff's treating physician.  According to the ALJ, Dr. Squitieri's purported failure to address Plaintiff's history of substance abuse and history of non-compliance with medication in the impairment questionnaire and the narrative report indicate that Dr. Squitieri was not properly familiar with Plaintiff's history when he prepared these reports.  But Dr. Squitieri's treatment records show that he certainly was familiar with Plaintiff's substance abuse history by the time he completed these documents in August 2016.  For example, after Plaintiff's first appointment with Dr. Squitieri on March 3, 2016, the doctor noted that Plaintiff had previously taken part in a drug rehabilitation program due to his marijuana use.  AR 413. Dr. Squitieri also discussed the importance of "not drinking alcohol or using [marijuana]" with Plaintiff a few weeks later, on March 31, 2016.  AR 410.  In a session on June 14, 2016, Plaintiff admitted that he drank sometimes with his friend, and had smoked marijuana the week before, prompting Dr. Squitieri to "[c]aution[] him again against drinking and using drugs which can worsen his symptoms."  AR 402, *see also* 404.  Even after Dr. Squitieri prepared the questionnaire and narrative report in August 2016, he continued to address the topic of substance abuse with Plaintiff in their sessions.  *See, e.g.*, AR 389, 391, 396, 398.  While substance abuse was not specifically referenced in the August 2016 questionnaire or the narrative report, to assert that Dr. Squitieri was unfamiliar with Plaintiff's history of substance abuse is to ignore ample evidence to the contrary in Plaintiff's treatment records.  This amounts to error, as an ALJ "may not ignore or mischaracterize evidence."  *Mercado v. Colvin*, No. 15-cv-2283 (JCF), 2016 WL

3866587, at *17 (S.D.N.Y. July 13, 2016) (citing *Erickson v. Comm'r of Soc. Sec.*, 557 F.3d 79, 82-84 (2d Cir. 2009)).[8]

Similarly, Dr. Squitieri's treatment notes also make clear that he was well aware of Plaintiff's past non-compliance with medication—treatment records include multiple references to discussion of the problematic consequences of noncompliance. *See* AR 410, 413-15. Over the course of Plaintiff's treatment by Dr. Squitieri, however, Plaintiff started to consistently report compliance with his medications, including for the approximately four months prior to when Dr. Squitieri filled out the impairment questionnaire and narrative report. *See* AR 400-09. Thus, when Dr. Squitieri stated in his narrative report that Plaintiff was "compliant with medications and visits," he was accurately reporting his observations from Plaintiff's treatment.[9] AR 364. Notably, even with Plaintiff's recent history of medication compliance, Dr. Squitieri still concluded that Plaintiff had substantial impairments. A careful review of Dr. Squitieri's records makes clear that he was attuned to the issue of Plaintiff's prior non-compliance with

---

[8] It is curious that the ALJ would critique Dr. Squitieri's supposed failure to address drug or alcohol abuse in the impairment questionnaire, given that the form itself specifically instructs the provider to *indicate only those limitation that exist in the absence of drug or alcohol abuse*." AR 362 (emphasis in original).

The Commissioner contends that even if Dr. Squitieri were justified in omitting information about past drug and alcohol abuse from the impairment questionnaire, his decision to omit such information from the August 4, 2016 narrative report creates grounds for discounting his opinion. Def.'s Mem. at 18-19. The Commissioner asserts that it is the narrative report, and not the "checkbox" questionnaire, that constitutes the substantive portion of a medical source's opinion. *Id*. But this argument has no merit here. ALJ Vecchio did not discount the questionnaire on the basis that it was a mere "checkbox" exercise—in fact, he accorded the same weight to both the questionnaire and narrative report, and had the same objections to each. *See* AR 17-18.

[9] Indeed, Dr. Halperin, in his testimony at the administrative hearing, confirmed based on his review of the medical records that Plaintiff "takes his medicine on a regular basis and he's reliable and interacts reliably with the medication." AR 69.

medication, and the fact that he did not discuss Plaintiff's history of non-compliance in the questionnaire or the narrative report is not a valid reason to discount the weight given to the opinions of Plaintiff's treating physician.

Ultimately, the ALJ's stated reasons for according Dr. Squitieri's opinions less than controlling weight do not rise to the level of "good reasons" under SSA regulations.  The ALJ asserted that the opinions should be given less weight because they were only informed by five months of treatment, but gave greater weight to sources who had only examined Plaintiff once, or never, and did not have a similarly longitudinal picture of his health.  And contrary to the ALJ's assertion, the fact that Dr. Squitieri did not discuss Plaintiff's prior substance abuse or medication compliance issues did not reflect a lack of familiarity with the Plaintiff at the time of these opinions.  The treatment records make clear that Dr. Squitieri knew about these issues, and there are easily understandable reasons why Dr. Squitieri would have elected not to address those points in the documents in question.  Further, the ALJ failed to address the fact that the opinions in question here were offered by a specialist, and he did not address at all how Dr. Squitieri's findings compared with other medical sources in the record.  *See* 20 C.F.R. §§ 404.1527(c)(2)(i)-(ii), (c)(3)-(c)(6); *see Cabrera v. Berryhill*, No. 16-cv-4311 (AT) (JLC), 2017 WL 3172964, at *11 (S.D.N.Y. July 25, 2017), *adopted by*, 2017 WL 3686760 (S.D.N.Y. Aug. 25, 2017) (remanding case where ALJ did not consider required (and "potentially favorable") factors like specialization and length of treatment relationship); *Calderon v. Comm'r of Soc. Sec.*, No. 16-cv-9002 (PKC) (RWL), 2018 WL 1466099, at *13 (S.D.N.Y. Mar. 5, 2018), *adopted by*, 2018 WL 1468687 (S.D.N.Y. Mar. 23, 2018) (requiring remand because "it is not clear from the decision that the ALJ properly considered whether [the treating physician's] opinion was consistent with the Record as a whole."); *Vasquez*, 2015 WL 4399685, at *20 (the ALJ "failed to consider the

required factors in according Dr. Taveras's opinion less than controlling weight, specifically the supportability of Dr. Taveras's opinion, and this omission necessitates remand").  The Court is left with limited, unpersuasive, and, ultimately, inadequate reasons for the ALJ's decision to discount the opinions of Plaintiff's only treating source.

The question of whether the ALJ properly weighed Dr. Squitieri's opinions regarding Plaintiff's limitations is critical to the resolution of his claim, as the opinions are potentially dispositive as to whether Plaintiff is disabled.  At the hearing, Plaintiff's counsel asked the vocational expert, Dr. Green, whether jobs existed for a hypothetical claimant with limitations similar to those that Dr. Squitieri had found, and Dr. Green testified that no that no jobs existed for such a claimant.  AR 79-80.  Consequently, it "cannot be said that the ALJ's analysis of [Dr. Squitieri's] medical opinion[ ] was harmless error because the [vocational expert] essentially testified that if the[ ] opinion[ ] were adopted, [Plaintiff] would be unable to work." *Archambault v. Colvin*, No. 13-cv-292, 2014 WL 4723933, at \*10 (D. Vt. Sept. 23, 2014); *see also Pines v. Colvin*, No. 13-cv-6850 (AJN) (FM), 2015 WL 872105, at \*10 (S.D.N.Y. Mar. 2, 2015), *adopted by*, 2015 WL 1381524 (S.D.N.Y. Mar. 25, 2015).

For all of these reasons, remand is warranted based on the ALJ's failure to properly apply the treating physician rule as to the opinions of Dr. Squitieri.

### c.  The ALJ's Improper Treatment of the Medical Expert Testimony

The ALJ also erred when he assigned significant weight to the opinion of Dr. Halperin, particularly given that he did so while also discounting the opinions of Dr. Squitieri.  Guidance issued by the SSA provides that "adjudicators at the hearings level may ask for and consider evidence from medical experts [ ] about the individual's impairment(s), such as the nature and severity of the impairment(s)."  SSR 17-2p, 2017 WL 3928306, at \*3.  "[I]t is not mandatory to

seek evidence from a medical expert . . . it is discretionary." *Ramos v. Berryhill*, 395 F. Supp. 3d 329, 343 (S.D.N.Y. 2019).  However, "[t]he medical opinion of a non-examining medical expert does not constitute substantial evidence and may not be accorded significant weight." *Scognamiglio v. Saul*, 432 F. Supp. 3d 239, 251-52 (E.D.N.Y. 2020); *Avila v. Comm'r of Soc. Sec.*, No. 20-cv-1360 (ER) (DF), 2021 WL 3774317, at *20 (S.D.N.Y. Aug. 9, 2021) ("assigning significant weight to the opinion of a non-examining medical expert—over the opinions of examining experts—can constitute error"), *adopted by* 2021 WL 3774188 (S.D.N.Y. Aug. 25, 2021).  Generally, "advisers' assessment of what other doctors find is hardly a basis for competent evaluation without a personal evaluation of the claimant." *Vargas v. Sullivan*, 898 F.2d 293, 295 (2d Cir. 1990); *see Roman v. Astrue*, No. 10-cv-3085 (SLT), 2012 WL 4566128, at *16 (E.D.N.Y. Sept. 28, 2012) (ALJ erroneously gave opinion of non-examining medical expert significant weight, while failing to properly apply treating physician rule).

Although Dr. Halperin testified after reviewing Plaintiff's entire medical record, Dr. Halperin never examined Plaintiff in person, and "[t]he ALJ's reliance on [Dr. Halperin's] opinion was therefore inappropriate, especially over [that] of Plaintiff's treating physician[]." *Scognamiglio*, 432 F. Supp. 3d at 251.  "[T]he fact that [Dr. Halperin] was a non-examining medical expert who only reviewed other physicians' findings in the record is sufficient ground *not* to afford [his] opinion significant weight." *Id.* (emphasis added).[10]

* * * * * * * * * *

---

[10] The ALJ also seemed to find it compelling that Dr. Halperin is board certified in the field of psychiatry.  AR 18.  Notably, Dr. Squitieri is also board certified by the American Board of Psychiatry and Neurology in the field of psychiatry.  *See* https://www.certificationmatters.org/practitioner (last visited Jan. 31, 2022).

Because the Court recommends that this case be remanded on the dispositive issue of the ALJ's legal error in failing to apply the treating physician rule to the opinions of Dr. Squitieri, as well as the improper assignment of significant weight to the opinion of Dr. Halperin, the Court need not reach the second aspect of judicial review, namely whether the ALJ's resolution of Plaintiff's case is supported by substantial evidence. *See Garcia v. Colvin*, No. 14-cv 3725, 2015 WL 5786506, at *26 (S.D.N.Y. Sept. 29, 2015) ("Where remand is appropriate because the ALJ failed to apply the correct legal principles, the Court should not, prior to remand, attempt to assess whether substantial evidence in the Record supports the ultimate disability determination.").

## CONCLUSION

For the foregoing reasons, I respectfully recommend that the Plaintiff's motion for judgment on the pleadings (ECF No. 14) be GRANTED, the Commissioner's motion for judgment on the pleadings (ECF No. 18) be DENIED, and that judgment be entered in favor of the Plaintiff.

## NOTICE

Pursuant to 28 U.S.C. § 636(b)(l) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections. *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days when service is made by mail). A party may respond to another party's objections within fourteen (14) days after being served with a copy. Fed. R. Civ. P. 72(b)(2). Such objections, and any responses to such objections, shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Vincent Briccetti, United States District Court, Southern District of

New York, 300 Quarropas Street, White Plains, New York, 10601, and to the chambers of the Honorable Andrew E. Krause at the same address.

Any request for an extension of time for filing objections or responses to objections must be directed to Judge Briccetti, and not to the undersigned.

**Failure to file timely objections to this Report and Recommendation will result in a waiver of objections and will preclude appellate review.** *See Thomas v. Arn*, 474 U.S. 140 (1985); *Smith v. Campbell*, 782 F.3d 93, 102 (2d Cir. 2015).

Dated: February 4, 2022
      White Plains, New York

                                    Respectfully submitted,

                                      _____
                                      ANDREW E. KRAUSE
                                      United States Magistrate Judge
                                      Southern District of New York